Tony A. BURGESS, Appellant,

v.

UNITED STATES, Appellee.

No. 90–CF–406.

District of Columbia Court of Appeals.

Argued Sept. 19, 1991.
Decided May 5, 1992.

1. The appeal of the codefendant is not before us.

I

Frederick J. Sullivan, appointed by this court, for appellant.

J. Patrick Rowan, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., and John R. Fisher, Roy W. McLeese, III, and June M. Jeffries, Asst. U.S. Attys., were on the brief, for appellee.

Before ROGERS, Chief Judge, and SCHWELB and WAGNER, Associate Judges.

PER CURIAM:

Appellant Tony A. Burgess appeals his convictions[1] by a jury on the principal grounds that the trial judge abused his discretion by (1) limiting bias cross-examination of a government witness, and (2) admitting testimony that the decedent called his assailant "Tony." We find no abuse of discretion by the trial judge in limiting cross-examination; the proffered testimony was unduly prejudicial while of limited relevance to bias. We also find no abuse of discretion in the admission of the decedent's statement. Accordingly, we affirm.

The government's case was presented principally through the testimony of two witnesses, Odily Campos and Carl Johnson. According to Ms. Campos, on the evening of January 14, 1988, she was at the Dome, a nightclub near Dupont Circle, where she saw Tell Rodolfo Maninant, a friend from high school whom she had not seen for two years. They left the nightclub and went with some friends to the Meeting Place, a restaurant on K Street. Campos had brought her car to the restaurant, and after the group had finished eating, Maninant asked Campos for a ride to a friend's house. Campos agreed, and they left the restaurant at approximately 4:30 a.m. Maninant sat in the front passenger seat giving directions to Campos.

After a short drive, Maninant and Campos arrived at a horseshoe-shaped structure of townhouses in the Sursum Corda area in Northwest Washington. Maninant directed Campos to drive around the townhouses and to stop near First Terrace and L Place. After the car stopped, two men approached the passenger side of the car, and began talking to Maninant. Campos heard Maninant call one of the men "Tony," and the other man "Leroy." Maninant asked for cocaine, and Tony asked Maninant for $200. Maninant got out of the car, and Tony asked Maninant if he had the thousand dollars that he owed him. Maninant replied that he had the money, whereupon Tony searched him but did not find any money. Maninant said that Campos, who he claimed was his sister, had the money. Maninant came back to the car and told Campos to tell Tony that she was his sister and had the money.

Tony became upset, told Maninant that he had "fucked up," and drew a gun. Maninant told Tony to "go ahead, shoot me." Tony responded that "I don't want to kill you, but you fucked up." Tony then came around to the driver's side of the car, and told Campos to open the door, which she

---

1. Appellant was convicted of second degree murder while armed, D.C.Code § 22–2403, – 3202 (1989), assault with a dangerous weapon,

did.[2] He pointed a gun at her head and asked her whether she had the thousand dollars. Campos responded that she was not Maninant's sister and she did not have the money. Tony slammed the door and went back to Maninant, asking once again if he had the money. Maninant said that he did, but he needed to get change.

Maninant started walking away from the car, and Tony followed him. Campos then heard two gunshots. Tony and Leroy then ran towards her car. As she was trying to flee, Campos opened the passenger door to let Maninant in the car, but Maninant told her to get out of the area and fell. Maninant was later taken to Washington Hospital Center where he was pronounced dead at 7:20 a.m.

Carl Johnson, who lived at 1151 First Terrace, Northwest, behind First Terrace and L Place, testified that he awoke at 4:30 a.m. on January 15, 1988. At that time his son Derrick had come into the house. Later that morning his wife told him that there had been some kind of car accident outside. Carl Johnson went to the door and saw two men running, one pursuing the other. He recognized one of the men as appellant, and at trial, identified him in the courtroom. As both men ran, Carl Johnson saw appellant catch up to the other man, pull out a gun and shoot him twice in the head.[3] According to Carl Johnson, these events occurred between 6:00 and 6:15 a.m., when his son Derrick was asleep.

Derrick Johnson testified for the defense. He claimed that he had been with appellant on January 15, 1988, for approximately two hours, until fifteen minutes before the shooting. At approximately 5:00 a.m. he had driven his car into a parking lot off First Terrace in Sursum Corda where he met appellant. Derrick saw Maninant in the parking lot in a car with a female, engaged in an apparent drug transaction. Derrick knew Maninant and was afraid of him because two months earlier Maninant had urinated on Derrick's front porch and pointed a gun at him.[4] According to Derrick, appellant went over to Maninant, then came back and asked Derrick if he could take him for something to eat. Derrick then drove to the Greyhound bus station on First Street, Northeast, where appellant had something to eat and Derrick played some video games. After about half an hour, they returned to Sursum Corda. Derrick dropped appellant off, parked his car in front of his house, had something to eat in his home and then went to bed. Approximately fifteen minutes later he heard gunshots.

Appellant also testified, as had Derrick, and contradicted Campos' version of events. He claimed that upon returning to Sursum Corda, he saw Maninant sitting in a car with a woman and another man. He heard Maninant call out "Tony," and he heard gun shots. When he saw Maninant moving toward him, he ran too. As he did, he saw Mrs. Johnson standing in the doorway of her house. He denied that he had shot Maninant.

## II

Appellant's first contention, that the trial judge impermissibly curtailed his bias cross-examination of Carl Johnson, does not require extended discussion. Appellant

---

id. § 22–502, and carrying a pistol without a license, id. § 22–3204.

2. Campos claimed that she did not get a good look at Tony, and could not describe him at trial.

3. On cross-examination Carl Johnson admitted that although he had given a description of the assailant to the police within hours of the crime he did not identify appellant by name as the murderer. Appellant also attempted to cross-examine Carl Johnson about his knowledge of an altercation between his son Derrick and the decedent in which Maninant had pulled a gun

on Derrick, but the trial judge would not allow it. The trial judge also would not permit appellant to cross-examine Carl Johnson about whether he knew that the decedent had put a contract on Derrick's life.

4. Prior to trial defense counsel had proffered that he intended to ask Derrick about the altercation and the contract that Maninant had on Derrick's life. Initially, the judge excluded all evidence regarding the altercation. Later, after concluding that the prosecution had opened the door during cross-examination, the judge permitted appellant to ask on redirect about the gun incident, but not the contract.

contends that the trial judge erred in restricting cross-examination of Carl Johnson regarding his knowledge of an altercation between Maninant and his son, Derrick, and the fact that Maninant had put a "contract" on his son's life. Appellant maintains that this testimony would be probative of bias since it would reveal that Carl Johnson had good reason to suspect that his son would be implicated in the murder, and, therefore, he identified appellant in order to shift suspicion away from his son.

Consistent with a defendant's Sixth Amendment rights, bias is always a proper subject for cross-examination. *See Porter v. United States*, 561 A.2d 994, 996 (D.C.App.1989). Nonetheless,

> the right to explore [bias] is not without its limits. The party posing the question must proffer to the court some facts which support a genuine belief that the witness is biased in the manner asserted, that there is a specific personal bias on the part of the witness, and that the proposed questions are probative of bias.

*Id.*

Defense counsel proffered that questions probing Carl Johnson's knowledge of the hostility between Maninant and his son would show that Carl Johnson identified appellant as the suspect in order to exculpate his son. Appellant's counsel did not proffer, however, that Carl Johnson knew at the time he gave his report of the murder to the police, see note 3, *supra,* that there had been an altercation between Maninant and his son. Nor did defense counsel indicate that Carl Johnson believed or had reason to believe that his son was going to be implicated in the murder. Carl Johnson testified that his son had gone to his room prior to the gunshots. There was no testimony that Derrick was at any time the focus of a police investigation or that Carl Johnson had reason to think at the time of trial that he was. *See Best v. United States*, 328 A.2d 378, 381 (D.C.App. 1974) (the time of trial testimony rather than the time of the offense is the time at which bias is to be examined). Nor was there anticipated testimony to link Derrick to the murder.[5] Hence, the foundation for appellant's bias theory was flawed because the proffer failed to suggest a motive for Carl Johnson to lie.[6]

Even assuming that the proffered testimony was relevant to bias, the trial judge did not abuse his discretion in refusing to permit cross-examination on this issue since the testimony would have been highly prejudicial. The evidence that Maninant had previously pulled a gun on Derrick and allegedly had put out a contract on Derrick's life "would have tended to 'invite a disposition based upon [a] good guy/bad guy comparison.'" *Hawkins v. United States*, 461 A.2d 1025, 1033 n. 13 (D.C.App. 1983), *cert. denied*, 464 U.S. 1052, 104 S.Ct. 734, 79 L.Ed.2d 193 (1984). The jury might have used this evidence, as well as the evidence of the prior incident, to infer that Maninant was a bad man who deserved what he got, rather than addressing the merits of the evidence offered by the government to prove his guilt. Hence, the trial judge could properly conclude that the evidence would be more prejudicial than probative.

Furthermore, the jury eventually heard about the prior incident between Derrick and Maninant, *see* note 4, *supra,* and hence appellant suffered no prejudice from the

---

**5.** The trial judge initially indicated that critical to his ruling on whether to allow the questioning was whether Derrick had told his father, Carl Johnson, about the prior incident with Maninant, noting the extreme prejudicial nature of the testimony (that the decedent got what he deserved). Later the judge concluded that there was nonetheless no basis for inferring bias since both Derrick and Carl would testify that Derrick was at home at the time of the shooting.

**6.** Appellant's contention that Carl Johnson's failure to give the police appellant's name sup-

ported the defense theory that his testimony and identification of appellant were tainted is meritless. Carl Johnson explained that his fear for his family was the reason that he had not identified appellant when he first spoke to the police. Contrary to appellant's contention in his brief, there was no proffer or evidence that Derrick had told his father about the altercation with Maninant prior to the shooting. Defense counsel explicitly disclaimed that he was suggesting that Derrick was involved in the killing.

judge's rulings about the altercation. There is nothing in the record to suggest that defense counsel would not have been permitted to argue the facts of the incident to the jury and ask the jury to draw reasonable inferences.

## III

■ Appellant also contends that the trial judge erred in admitting the testimony of Campos that she heard Maninant call the man who shot him "Tony." As noted in the two concurring opinions, we disagree.[7] Accordingly, we affirm the judgments of conviction.

ROGERS, Chief Judge, concurring:

In pretrial proceedings, the defense counsel objected on hearsay grounds to the prosecutor's request for permission to bring out during direct examination of the government's first witness, Campos, what she had heard Mainant say in addressing one of the two men. The prosecutor argued that the "Tony" statement was ad-

missible under the present sense exception to the hearsay rule, and the trial judge agreed. If, as the government now argues, Maninant's addressing of the shooter as "Tony" is not hearsay at all, then there was no error in admitting the statement for its truth.[1] *See* opinion of Judge Wagner, joined by Judge Schwelb. However, at trial the parties and the trial judge treated the statement as hearsay, and in my view the trial judge correctly applied the present sense impression exception embodied in FED.R.EVID. 803(1).[2]

Statements concerning events which the declarant is observing at the time he or she makes the declaration fall within the hearsay exception for present sense impression.[3] *See* E. CLEARY, McCORMICK ON EVIDENCE, § 298, at 860 (3rd ed. 1984). FED. R.EVID. 803(1) excepts from the hearsay rule statements, although hearsay, "describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter."

---

**7.** Two additional claims raised by appellant merit little discussion. We find no abuse of discretion by the trial judge in limiting direct examination of Derrick Johnson. The government did not dispute that Derrick knew Maninant; or that Maninant was at Sursum Corda at approximately 5:00 a.m. on January 15, 1988. Thus, evidence that Maninant had a contract on Derrick's life would not, as appellant contends, give "strength and certitude to Derrick Johnson's identification of Maninant as being involved in an alleged drug transaction approximately one hour before the murder."

Appellant's claim that there was insufficient evidence to convict him of second degree murder while armed, assault with a dangerous weapon, and carrying a pistol without a license, is meritless. *See, e.g., McAdoo v. United States,* 515 A.2d 412, 427 (D.C.App.1986) (standard of review of claim of insufficient evidence). Campos testified that a person whom Maninant called Tony pulled a gun while talking with Maninant, and later shot him. Carl Johnson testified that he saw appellant chase Maninant and then shoot him; he identified appellant in court. The government introduced evidence that there was no record that appellant had a license to carry a gun.

**1.** In its brief on appeal, the government maintains that the statement was not hearsay because "there is nothing to indicate that the decedent intended his statement as an assertion." It relies on *United States v. Long,* 284 U.S.App.D.C. 405, 412–13, 905 F.2d 1572, 1579–80, *cert. de-*

*nied,* —— U.S. ——, 111 S.Ct. 365, 112 L.Ed.2d 328 (1990) (telephone conversation related by police officer, who answered the telephone during search of apartment for illegal drugs, where the caller asked to speak to "Keith"—the codefendant's first name—and then upon being told "Keith" still had "stuff," asked if someone could come around to pick up the "fifty;" not hearsay because no assertion intended).

**2.** This court has defined hearsay as an (1) assertion of fact or belief (2) made out of court, and (3) offered to prove the truth of the matter asserted. *See Jenkins v. United States,* 415, A.2d 545, 547 (D.C.1980). " '[A]ssert' " carries no connotation of being positive or strong ... [but] simply means to *say that something is so, e.g.* that an event happened or that a condition existed." E. CLEARY, McCORMICK ON EVIDENCE, § 246, at 729–30 (3d ed. 1984) (emphasis added). Here, the trial judge's conclusion, that the statement "Tony" meets the definition of hearsay, was based on his view that by uttering the name of one of the men Maninant was stating that a condition existed, *i.e.,* he had observed Tony.

**3.** On appeal appellant acknowledges that the trial judge allowed the statement into evidence under the present sense impression exception to the hearsay rule, but his brief focuses on the state of mind exception to the hearsay rule. The government does not argue on appeal that the statement was admissible under the state of mind exception.

Historically, the present sense impression exception to the hearsay rule is one of the four hearsay exceptions encompassed by the ancient term *res gestae:* (1) statements of present bodily condition, (2) statements of present mental states and emotions, (3) excited utterances, and (4) statements of present sense impression. *See Steadman v. United States,* 358 A.2d 329, 332 (D.C.1976); *Watts v. Smith,* 226 A.2d 160, 162 (D.C.1967); *Wabisky v. District of Columbia Transit Sys. Inc.,* 114 U.S.App. D.C. 22, 23, 309 F.2d 317, 318 (1962); McCORMICK, *supra,* § 288, at 835. Recently, the vague, general term *res gestae* has been used less frequently, and courts have begun to refer to the exceptions individually. *See* McCORMICK, *supra,* § 288, at 836. While this court has had occasion to discuss the first three *res gestae* exceptions,[4] and has referred to the present sense impression exception,[5] the court has yet formally to recognize the fourth exception.[6]

The present sense impression exception to the hearsay rule is well rooted in our common law. The decisions of this court have used the term *res gestae* and admitted statements under this general doctrine. *See e.g., Watts, supra,* 226 A.2d at 162. Statements of present sense impression, like statements of (1) present bodily condition, (2) present mental states and emotions, and (3) excited utterances, possess a degree of spontaneity which is the foundation of their trustworthiness. *See Nicholson, supra,* 368 A.2d at 564 (excited utterances trustworthy because they are made without opportunity for reflection); McCORMICK, *supra,* §§ 228, 298, at 836 & 860 (statements spontaneously made present less of an opportunity for fabrication); *see also United States v. Leonard,*

161 U.S.App.D.C. 36, 49, 494 F.2d 955, 968 (1974) (noting similarities between excited utterance and contemporaneous declaration (present sense impression)). There is no principled basis, therefore, on which to recognize these three exceptions, but not the present sense impression exception to the hearsay rule since all four exceptions are founded on the same policy.

Furthermore, statements admitted under present sense impression possess other indicia of reliability besides spontaneity. *See Laumer v. United States,* 409 A.2d 190, 199 (D.C.App.1979) (look to indicia of reliability to determine whether to recognize hearsay exception). Statements concerning events that the declarant is observing at the time he or she makes the declaration have the advantage of contemporaneity of the event and statement. *See United States v. Narciso,* 446 F.Supp. 252, 285 (E.D.Mich.1977); FED.R.EVID. 803 advisory committee note; McCORMICK, *supra,* § 298, at 860; ("since the [statement] concerns observations being made at time of the statement it is safe from any error caused by a defect of the declarant's memory"). Also, because the statement is made contemporaneously with the observation there is little room for fabrication. *Narciso, supra,* 446 F.Supp. at 285; McCORMICK, *supra,* § 298, at 860. Nor does the exception suffer from the perceived deficiencies of the excited utterance exception in the sense that statements made in a state of excitement may impair the accuracy of observation. *See* FED.R.EVID. 803(1) (advisory committee note) (discussing criticism of excited utterance rule).

Given the indicia of trustworthiness underlying the present sense exception, there is no reason not to adopt it and the princi-

---

**4.** *See Mitchell v. United States,* 569 A.2d 177, 186 (D.C.App.) (present bodily condition), *cert. denied,* —— U.S. ——, 111 S.Ct. 521, 112 L.Ed.2d 532 (1990); *Gezmu v. United States,* 375 A.2d 520, 522 (D.C.App.1977) (state of mind); *Nicholson v. United States,* 368 A.2d 561, 564 (D.C.App. 1977) (excited utterance).

**5.** *See Pratt v. District of Columbia,* 407 A.2d 612, 616 n. 6 (D.C.App.1979); *see also Wabisky, supra,* 114 U.S.App.D.C. at 23, 309 F.2d at 318.

**6.** At least twenty-eight states recognize the present sense impression exception to the hearsay rule. *Booth v. State,* 508 A.2d 976, 979 (Md.1986) (listing states). Some jurisdictions require precise contemporaneity and delete the words "immediately thereafter" found in the federal rule. *Id.* at 980. The Court of Appeals of Maryland observed that "because the presumed reliability of a statement of present sense impression flows from the fact of spontaneity, the time interval between observation and utterance must be very short." *Id.* at 981.

ples underlying FED.R.EVID. 803(1), which embody the concerns of the common law with respect to spontaneity and contemporaneity.[7] Accordingly, the trial judge could properly look to FED.R.EVID. 803(1) for guidance, *see Laumer, supra,* 409 A.2d at 199 (look to indicia of reliability to determine whether to recognize hearsay exception), and in my view correctly applied the present sense exception to the "Tony" statement. *See United States v. Delaplane,* 778 F.2d 570, 574 (10th Cir.1985) (statement in telephone conversation "Michael's back" admissible under present sense impression), *cert. denied,* 479 U.S. 827, 107 S.Ct. 104, 93 L.Ed.2d 54 (1986); *Brown v. Tard,* 552 F.Supp. 1341, 1351 (D.N.J.1982) (statement in telephone conversation that man was in apartment to fix air conditioner admitted under present sense impression). FED.R.EVID. 803(1) requires a (1) statement (2) describing or explaining an event or condition, (3) made while the declarant was perceiving the event or condition, or immediately thereafter. The event or condition being explained at the time it was being observed was, as the trial judge found, that Maninant was saying, in so many words, "there's Tony. I'm speaking to Tony." The statement "Tony" described whom Maninant had seen. There is no contention that the statement was not contemporaneous with the event Maninant was describing.

Apart from the statement itself, there also were other indicia of its trustworthiness. *See Laumer, supra,* 409 A.2d at 200 (look to indicia of trustworthiness); *Brown v. Tard, supra,* 552 F.Supp. at 1351. Carl Johnson testified that he knew appellant (who had gone to school with two of his children), whose first name is Tony, and saw him in the area on the morning in question and saw him shoot the decedent.

When the person described by Compos was addressed as Tony, he said nothing to indicate that he was not.

WAGNER, Associate Judge, with whom SCHWELB, Associate Judge joins, concurring:

I concur in the result reached by the court affirming the judgments of conviction. However, in addressing appellant's argument that the trial court erred in admitting testimony that the victim called his assailant, "Tony," it is not necessary, in my view, to decide whether the remark falls within an exception to the hearsay rule. The mere utterance of the name, "Tony," does not constitute hearsay. I write separately to explain the reasons for this conclusion. Thus, I do not join my concurring colleague in resolving the hearsay exception question because, in my opinion, it is not necessary to reach it.

The opinion of the court provides an accurate recitation of the facts, and it is only necessary to repeat a few which are pertinent to this opinion. Odily Campos, a witness for the government, testified that she drove the victim, Rodolfo Maninant, to an area where he asked her to wait when he got out of the car to speak to appellant and another man. According to Ms. Campos' testimony, Maninant referred to one man (appellant) as "Tony" and to the other man as "Leroy" and "Rob." Appellant challenges as reversible error only the admission of the word "Tony," which the trial court allowed under the "present sense impression" exception to the hearsay rule. The remaining dialogue between the men, which Ms. Campos overheard and recounted at trial, is not challenged as inadmissible hearsay.

The Federal Rules of Evidence provide guidance for disposition of the issue.[1] The federal rules define a statement as an oral

---

7. *See Butler v. United States,* 481 A.2d 431, 439 (D.C.App.1984) (adopting approach of FED. R.EVID. 801(d)(2)(E), co-conspirator exception), *cert. denied,* 470 U.S. 1029, 105 S.Ct. 1398, 84 L.Ed.2d 786 (1985); *Laumer, supra,* 409 A.2d 190 (adopting approach of FED.R.EVID. 804(b)(3) for statements against penal interest). *See also* FED.R.EVID. 803(1) advisory committee note; McCORMICK, *supra,* § 298 at 861–62.

1. "While the Federal Rules of Evidence are not generally applicable to the Superior Court of the District of Columbia, we have had occasion to consider them as authoritative on issues of law in the District of Columbia." *See Yeager v. Greene,* 502 A.2d 980, 985 n. 13 (D.C.App.1985).

or written assertion or nonverbal conduct which is intended as an assertion. FED. R.EVID. 801(c). *See Laumer v. United States,* 409 A.2d 190, 194 (D.C.App.1979) (en banc); *see also Jenkins v. United States,* 415 A.2d 545, 547 (D.C.App.1980). Under the federal rules, a statement is not an assertion unless it is intended to be one. *United States v. Long,* 284 U.S.App.D.C. 405, 412, 905 F.2d 1572, 1579 (quoting FED. R.EVID. 801 Advisory Committee note), *cert. denied,* —— U.S. ——, 111 S.Ct. 365, 112 L.Ed.2d 328 (1990); *United States v. Lewis,* 902 F.2d 1176, 1179 (5th Cir.1990); *United States v. Zenni,* 492 F.Supp. 464, 468 (E.D.Ky.1980). No distinction is made between the spoken and written word. FED.R.EVID. 801(a) and (c); *United States v. Weeks,* 919 F.2d 248, 251 (5th Cir.1990). In determining what is an assertion, "the crucial distinction under Rule 801 is between intentional and unintentional messages, regardless of whether they are express or implied." *Long,* 284 U.S.App.D.C. at 413, 905 F.2d at 1580.[2] Statements which unintentionally impart a message are regarded as having an inherent trustworthiness which diminishes significantly any need for cross-examination to test the declarant's credibility. *Id.* Where the declarant does not intend to assert a fact or communicate a belief, his or her truthfulness in making a comment is not considered to be an issue. *United States v. Groce,* 682 F.2d 1359, 1364 (11th Cir.1982). Thus, "an unintentional message is presumptively more reliable" than an intentional one. *Long,* 284 U.S.App.D.C. at 413, 905 F.2d at 1580. Such evidence is not generally excludable under the hearsay rule, the primary purpose of which is "to exclude declarations when their veracity cannot be tested through cross-examination." *Id.*

When the victim referred to appellant as "Tony," the evidence discloses no intention on the victim's part to introduce or otherwise identify "Tony" to anyone. The mere use of the name in the context recounted served no assertive purpose. The reference was made before the dispute arose which preceded the murder. Thus, it cannot be inferred that Maninant attempted to signal Campos that he was in danger or that he wanted to convey that he was talking to an individual named Tony. When the focus is placed upon Maninant's intent, it is clear that he did not intend to make an assertion or to communicate to anyone the fact that the person with whom he spoke was Tony. The word "Tony" appears to have been no more than a salutation or the typical personal reference made in conversation. Under the circumstances, any message conveyed can be classified only as incidental and not intentional under the analysis in *Long.* Therefore, the evidence falls outside of the hearsay rule as the declarant did not intend to make an assertion. *See* 4 J. WEINSTEIN & M. BERGER, WEINSTEIN'S EVIDENCE ¶ 801(a)[01] (1988) ("when a person acts in a way consistent with a belief but without intending by his act to communicate that belief, one of the principal reasons for the hearsay rule—to exclude declarations the veracity of which cannot be tested by cross-examination— does not apply, because the declarant's sincerity is not then involved") (footnote omitted); *Zenni, supra,* 492 F.Supp. at 467–79.

The federal circuits uniformly have rejected the notion that the mere use of a person's name constitutes hearsay evidence, admissible only under an exception to the hearsay rule. In *United States v. Weeks, supra,* the Fifth Circuit rejected the claim that the testimony of a warden that

---

**2.** In *Long,* a police officer answered the telephone of one co-defendant during the course of a search of his apartment. An unidentified caller asked for "Keith," the appellant, and whether Keith "still had any stuff," a "fifty" and whether "'Mike' could come around to pick up the 'fifty.'" 284 U.S.App.D.C. at 412, 905 F.2d at 1579. The Circuit Court, focusing on the intent of the caller, determined that although the caller may have conveyed messages about the appellant,

the caller did not intend to assert that the defendant was involved in drug dealing, and the message conveyed was incidental and unintentional. *Id.* at 413, 905 F.2d at 1580. The court found that the appellant failed to meet his burden of showing an intent to make an assertion, and therefore, found no error. *Id.; see also United States v. Hensel,* 699 F.2d 18, 31 (1st Cir.), *cert. denied,* 461 U.S. 958, 103 S.Ct. 2431, 77 L.Ed.2d 1317 (1983).

he heard other inmates call the accused "Gato," was hearsay as the testimony "reported non-assertive oral conduct." 919 F.2d at 251. From this evidence, the jury could infer that the warden had personal knowledge of the name, acquired by hearing others use it in a non-assertive manner, as is often the case with names. *Id.* The kidnap victims had heard their kidnappers use the names, "Jimmy" and "Gato," and the reference helped establish that the defendant, whose nickname was "Gato," was one of the perpetrators of the crime. *Id.* Nevertheless, the court found no error in the admission of the evidence, since appellant, the party claiming that the use of the nickname was intended as an assertion, failed to meet his burden of establishing that an assertion was intended. *Id.* at 252.

In *United States v. Snow,* 517 F.2d 441 (9th Cir.1975), the appellant sought reversal of his conviction of possession of an unregistered firearm on the ground that the trial court admitted as evidence a name tape bearing his name which was affixed to a briefcase in which the gun was found. In rejecting the argument that the name tape, standing alone, was a testimonial assertion, the court held that the name tape constituted "an evidentiary fact, *other than an* assertion 'from which the truth of the matter asserted is desired to be inferred.'" *Id.* at 443 (quoting 1 WIGMORE, § 25 (3rd ed. 1940) and emphasis added). The court concluded that the name tape was not hearsay, but circumstantial evidence. *Snow, supra,* 517 F.2d at 444. "[A] name, however learned, is not really testimonial. Rather, it is a bit of circumstantial evidence." *United States v. May,* 622 F.2d 1000, 1007 (9th Cir.1980); *Snow,* 517 F.2d at 443–44. As such, its vitality depends upon the factfinder drawing inferences from the use of the name, some of which may be conflicting and some of which may be explained away. *Id.* at 444 (citing 1 WIGMORE, § 148 (3rd ed. 1940)).

Similarly, in a case in which an appellant claimed as error the admission into evidence of a glass bearing the word "Dink," appellant's nickname, the First Circuit, concluding that the evidence was not hearsay, found no error. *United States v. Hensel,* 699 F.2d 18, 31 (1st Cir.1983). The court observed that "no assertion intended by the act of putting the word on the glass was relevant to the chain of inferences the government wished the jury to draw." *Id.* What the jury was asked to infer was that the appellant, Dink Hensel, "was likely to have possessed a glass with the name 'Dink' on it," an inference which is "merely circumstantial." *Id.* Likewise, in the instant case, the word "Tony" is merely circumstantial evidence that the assailant's name might have been "Tony," since the victim called him that. *See id.*

For the foregoing reasons, it is my view that the challenged evidence was not intended to be an assertion and falls outside of the scope of the hearsay rule. Therefore, I conclude on that basis that the trial court did not err in admitting the testimony.